Argued September 24; affirmed December 8, 1942

ELLINGSWORTH et al. *v.* JACKSON et ux.

(131 P. (2d) 781)

Before Kelly, Chief Justice, and Bailey, Lusk, Rand, Rossman and Brand, Associate Justices.

*Ralph A. Coan*, of Portland, and *Joseph McKeown*, of Marshfield (Andrew J. Newhouse, of Marshfield, on the brief), for appellants.

*J. B. Bedingfield*, of Marshfield (Bedingfield & Grant, of Marshfield, on the brief), for respondents.

KELLY, C. J. On the 11th day of November 1940, plaintiffs and defendants entered into a written contract which was dated as of the 9th day of November 1940, wherein and whereby, in consideration of the sale, transfer and delivery to them by defendants of all of the preferred and common capital stock of Lakeside Supply Inc., a corporation, plaintiffs agreed to sell and convey to defendants several parcels of real property one of which is situated in Willamina, Yamhill county, Oregon, another in Vernonia, Columbia county, Oregon, and another parcel, part of which is in, and the remainder adjoining, Garden Home, Washington county, Oregon; and plaintiffs also agreed to sell, assign and transfer to defendants a sales contract on real property known as the Theis Farm in Yamhill county, Oregon; and to sell and transfer to defendants 2,051 cases of tall fancy oysters and 670½ cases of tall cuts oysters located in the Southern Pacific warehouse in North Bend, Oregon; and to sell, assign and transfer to defendants a credit of $3,600 with the Willapa Oyster Company of Seattle, Washington.

Lakeside Supply Inc. was conducting a resort business, known as Currier's Village, on Tenmile Lake at Lakeside, Coos county, Oregon, which business consisted of the operation of auto courts and cabins, the

Pier Cafe, boats, riding stables, etc. The corporation owned the real estate upon which its business was being conducted.

Differences having arisen between the parties to the agreement dated November 9, 1940, a written proposal dated November 26, 1940, for the compromise of those differences was prepared by plaintiffs' attorneys, signed by plaintiffs and submitted to defendants. This written proposal does not expressly refer to any alleged misrepresentation on the part of defendant, Edward Jackson, but does contain the following clause:

"* * * and this proposal and offer of compromise of differences is to include all differences between the parties, and the acceptance of this proposal of compromise by the Lakeside Supply Inc., shall be supplemental to, and be the end of differences between the parties to said original agreement."

On December 2, 1940, a modification of the proposal of November 26, 1940, signed by plaintiffs was submitted to defendants. This proposed modification contained no specific reference to any alleged misrepresentation.

On December 4, 1940, a written counter-proposal signed by "Lakeside Supply, Inc. by Edward Jackson President", was submitted to plaintiffs. In this counter-proposal no express reference is made to any specific misrepresentation; however, paragraph 7 thereof is as follows:

"It is understood between us that you have personally inspected all the physical properties and assets of Lakeside Supply Inc. referred to in any or all of the above mentioned documents, and that your agreement to these provisions and acceptance of said property shall be based solely upon such

inspection and without representation on our part except as in all of said above mentioned documents expressly contained or thereby required to be made in deeds and bills of sale.''

On December 6, 1940, plaintiffs accepted and agreed to the provisions and conditions contained in said counter-proposal.

On December 19, 1940, the parties hereto made and entered into an escrow agreement pursuant to said agreement of November 9, 1940, and said agreement of compromise and settlement; and, in accordance with the terms thereof, placed in escrow with the First National Bank of Sheridan, Oregon, records of Lakeside Supply Inc., together with its stock certificates, documentary stamps, bill of sale of personal property of said Lakeside Supply Inc., insurance policies, tax receipts, receipts for corporation fees, written leases on signs to be delivered to plaintiffs upon compliance by them with the terms of said agreement, and there was also deposited with said bank muniments of title, abstracts thereof, bill of sale executed by plaintiff, W. E. Ellingsworth and cash in excess of $3,400 to be delivered to defendant, Edward Jackson, in accordance with the following provision in said escrow agreement:

"All of the documents and cash referred to in the foregoing paragraphs No. (A) and (G) inclusive, and subparagraphs thereof, to be paid over and/or delivered to Jackson or his attorney, and of the cash therein referred to, $1,000.00 thereof shall be retained by the bank in escrow as a guarantee of the compliance with the agreements of Jackson on his part to be performed, and the remainder thereof to be paid over to, and credited to the account of said Jackson or his assigns, in the First National Bank of Sheridan, and said bank is di-

rected to advise the said Jackson of each such credit so made and given to his account forthwith upon entry thereof.''

On December 20, 1940, an exchange of the physical possession of the properties of the respective parties was made and completed.

Plaintiffs allege that they were induced to enter into said agreement of exchange of properties and modifications thereof and said escrow agreement, and to perform the same, upon the representations of defendant, Edward Jackson, as to the amount of the fixed and operating costs and expenses of said business and upon the representations by said defendant that the business of said corporation was a highly profitable one and that the net profits earned and realized by said corporation for the nine months, from January 1, 1940, to September 30, 1940, was in the sum of $9,000, whereas in truth and in fact said representations and statements were false and untrue.

Defendants deny that said defendant, Edward Jackson, made the statements and representations attributed to him by plaintiffs.

Defendants base their second defense upon the fact that, subsequent to the said charge having been made by plaintiffs that said defendant Edward Jackson had made the misrepresentations aforesaid, the aforesaid compromise of differences was made by the parties hereto wherein, as a consideration therefor, defendants agreed to a reduction of $3,950 in moneys, credits and values to be paid and transferred to defendant, Edward Jackson, for the corporate stock of Lakeside Supply Inc.

Plaintiffs contend that said agreement of compro mise had no reference to the alleged misrepresentations

of defendant, Edward Jackson, but referred only to shortages in equipment and the fact that only an undivided one-half interest in a certain piece of real property included in the original trade was owned by said corporation, while it was understood that said defendant owned said piece of real estate in its entirety.

Defendants, for their third further and separate defense, allege that prior to November 9, 1940, and thereafter and prior to November 26, 1940, plaintiffs came to Lakeside, Oregon, on several trips, remained there for several days at a time, and at all said times had access to and did independently and carefully inspect all the properties of said Lakeside Supply Inc. including all books, records of accounts, records of receipts and expenditures and daily records of operation of said corporation, covering a period of more than one year prior to the dates of said inspections; and thus by such independent inspection and investigation on their part, plaintiffs gained and had full and complete knowledge of the true and correct amounts of moneys received and expended by said corporation, and the purposes for which the expenditures were made.

By paragraph III-A, being an amendment to defendants' answer permitted during the trial to conform to the facts proven, defendants also allege:

"Plaintiffs went into possession of all of said properties and took over the management of Lakeside Supply Inc. on December 20, 1940, and have continued in possession and management thereof since said date; and thereby gained further knowledge and information as to the condition, value and earning capacity thereof; that on the 5th day of February, 1941, the defendants obtained possession of and inspected and knew the contents of the profit and loss statement of said Lakeside Supply Inc. for the fiscal year of its business ending August 31,

1940. That thereafter and with full knowledge of all the facts, earnings, losses, income and value of said business and property, the plaintiffs did enter into contracts in behalf of said corporation for major alterations, improvements and changes of its said property and business, and did hold, manage and treat said property and said corporate business without regard to any claimed misrepresentations pertaining thereto, and did thereby waive each and every alleged and claimed fraudulent act and/or misrepresentation of defendants and of any agent of defendants.''

The first instance of alleged misrepresentation as to net receipts by defendant Edward Jackson occurred early in the month of October, 1940. Mr. J. B. Ellingsworth gave his version of it by saying that he had accompanied Mr. T. W. Zimmerman and wife to Lakeside and that he was present in the main office of the Lakeside Supply Inc. when Mr. Jackson gave Mr. Zimmerman some figures on the income and operating costs of the corporation for the first nine months of 1940.

The following is an excerpt from Mr. J. B. Ellingsworth's testimony:

"A. Mr. Jackson and Mr. Zimmerman went over it and Mr. Jackson says, well, February so much, April so much, March so much, and down the line to October 1st. He says, what was your expenditures that totals up so much money, how much was your expenditures, and Mr. Jackson gave him the expenditures.

Q. You don't remember the figures?

A. No.

Q. All right—

A. But I remember this because I was interested. They footed it all up and he subtracted from the total amount of his footings of the receipts and then he totalled up the expenditures and subtracted

that and he said that leaves approximately seventy-five hundred dollars from your receipts. Now then, he says, how about your trip that you took to Canada and two trips to California, how did you pay that. He said, I paid it out of the general fund. He said, that should be added to this here, should it not, and he said yes. He said, how much was that—approximately fifteen hundred dollars.

Q. Who said that?

A. Mr. Jackson.

Q. All right—

A. All right, then, Mr. Zimmerman said, that would make your net receipts here then approximately nine thousand dollars. Yes, Mr. Jackson says, that is approximately correct.''

Mr. W. E. Ellingsworth testified that on November 10, 1940, in company with his father, his wife, and his 12-year-old brother, he went down to Lakeside. The following is an excerpt from his testimony:

''Q. Tell us about the conversation which you had with either Mr. Zimmerman or Mr. Jackson, at that time, relative to the income of the property?

A. When we got there, we got out of the car, Mr. Zimmerman introduced me to Mr. Jackson.

Q. Did you look at some of the properties?

A. We had just gotten there. Dr. and Mrs. Holbrook and Mrs. and Mr. Zimmerman were already there. I was introduced to Mr. Jackson and Mr. Zimmerman made the suggestion that we look at some of the cottages and we started to walk down the driveway between the cottages.

Q. Yes—

A. I asked Mr. Jackson, I said, I understand that this property netted nine thousand in the last nine months, nine thousand dollars, is that so, And Mr. Jackson said, just about so. I said, what do you mean by just about so. Mr. Zimmerman spoke up and he said, well, Mr. Jackson took a trip to California and I believe was married in Canada, I

think he mentioned paying for an operation, and paying his son, I don't know what it was about, and he said, to sum it all up, which expenditures were checked out of the common checking account, to sum it all up it netted approximately nine thousand dollars.

Q. For what period of time?
A. Nine months.
Q. Did Mr. Jackson tell you that?
A. Yes."

Defendant, Edward Jackson, disclaims having made any such statement. Mr. T. W. Zimmerman died on May 1, 1941.

The record discloses a number of alleged statements made by Mr. Zimmerman.

The record discloses that Dr. Holbrook was acting as the agent of defendants and that, pursuant to a custom of real estate brokers, he and Mr. Zimmerman pooled their commissions and agreed that the same should be shared equally between them.

■ In the opinion of the writer, the testimony in support of the charge of misrepresentation by Mr. Jackson when considered with that of Mr. Jackson and his wife is not of the convincing character required to warrant a finding that Mr. Jackson was guilty of fraud.

Mr. Jackson testified in effect that he caused a memorandum of some of the expenditures to be prepared by the young lady, who had charge of the books, and gave that to Mr. Zimmerman. That it was understood that such memorandum was incomplete.

■ As the writer views this record, the decisive obstacle to a decree in favor of plaintiffs is that the written offer of compromise and settlement made by plaintiffs, as hereinabove stated, expressly purports to in-

clude all differences between the parties and to be supplemental to and the end of differences between the parties to the original agreement; and the counter-proposal of December 4, 1940, made by defendants and accepted on December 6, 1940, by plaintiffs expressly provides that assent thereto and acceptance of the property in suit should be based solely upon inspection and without representation on the part of defendants except as shown by documents expressly mentioned, or by deeds or bills of sale.

Plaintiffs claim that this compromise agreement had no reference to the alleged misrepresentations by Mr. Jackson. On the other hand Mr. Zimmerman and Dr. Holbrook, witnesses for defendants, and defendants themselves testify that the matter of the alleged misrepresentations was heatedly discussed between the parties hereto before the compromise settlement was consummated, and that it was mutually agreed that the matter of alleged misrepresentations would not be specifically or explicitly mentioned in the written agreement.

There is in the record a letter dated November 22, 1940, addressed to Mr. Otto Heider, who at that time was plaintiffs' attorney and who drew up the offer of compromise of November 26, 1940. This letter was signed by defendants' attorneys. Mr. Heider testified that he had it when he prepared the offer of compromise of November 26, 1940. The final paragraph of that letter is as follows:

"So far as I know, neither party to this exchange has made any representations to the other as to value of physical property involved; but inasmuch as they have both dealt through real estate agents, I believe there should be a mutual written statement signed by both sides of the deal to the effect

that each has inspected the properties he is to receive and accepts them without any representations or warranty as to value or earning capacity.''

It is evident from the foregoing, that the matter of representations as to value or earning capacity was considered by the parties through their attorneys before the compromise agreement was executed.

The testimony is conflicting, but to the writer the defendants have established their defense based upon their claim that the compromise agreement settled, determined and disposed of all differences between the parties including plaintiffs' claim of misrepresentations on defendants' part. This conclusion is strengthened by the fact that the learned trial judge, who saw and heard the witnesses, found in favor of defendants.

■ Plaintiffs support their claim of right to rescind by the fact that for the year 1940 the taxes assessed against Currier's Village amounted to much more than were represented by defendants and their real estate brokers. Plaintiff, R. E. Ellingsworth, testified that it was represented that the taxes for nine months were six hundred dollars, or six hundred and some odd dollars; and that he stated to defendants' attorney that in fact for one year they were $1,850. There is in the record, however, an abstract of title which states that the taxes upon that property for 1940 were $1,316.90. This abstract was placed in the hands of plaintiffs' attorney and examined by him before the agreement of compromise and settlement was executed. In this abstract, upon the page devoted to judgments, city liens and taxes, it is expressly stated that this statement does not cover city liens. The writer

finds nothing in the record impeaching or challenging the accuracy of the tax statement made by the abstracter. It is inconceivable that plaintiffs' attorney, to whom was entrusted the duty of examining the abstract, would fail to note the explicit statement therein concerning such an important phase of the record of title. Plaintiffs are bound by the action of their attorney when within the scope of his employment. Whether he was authorized to release the papers in escrow as and when he did, certainly notice to him of the amount of the taxes given by the abstracter in an abstract, which he was employed to examine and pass upon, would be notice thereof to his client.

Plaintiffs' course in placing electric signs upon the property and in making substantial repairs thereupon after being fully apprised of the facts might well be deemed a waiver of any right to rescind which theretofore they may have had; but it is not upon that point that this decision is placed.

"The law favors the amicable settlement of controversies, and it is the duty of courts rather to encourage than to discourage parties in resorting to compromise as a mode of adjusting conflicting claims. The nature or extent of the rights of each should not be too nicely scrutinized. Courts should, and do, so far as they can do so legally and properly, support agreements which have for their object the amicable settlement of doubtful rights by parties; the consideration for such agreement is not only valuable, but highly meritorious. Because they promote peace, voluntary settlements of differences between parties having legal capacity to contract in respect of their rights, where all have the same knowledge or means of obtaining knowledge concerning the circumstances involving their rights and where there are no fraud, misrepresentations, concealments, or other misleading incidents,

must stand and be enforced if intended by the parties to be final, notwithstanding the settlement made might not be that which the court would have decreed if the controversy had been brought before it for decision. Such agreements are binding without regard to which party gets the best of the bargain or whether all the gain is in fact on one side and all the sacrifice on the other." 11 Am. Jur. 249.

■ No fraud, misrepresentations, concealments or other misleading incidents are shown as an inducement to the execution by plaintiffs of the agreement of compromise and settlement. Its terms, therefore, should be and are controlling.

The decree of the circuit court is affirmed.