Argued and submitted November 9, 1998, reversed February 24, 1999

MARIAN ESTATES,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT
and Karen S. Grosh,
*Respondents.*

(EAB 98-AB-0570; CA A101930)

976 P2d 71

Kevin L. Mannix argued the cause and filed the brief for petitioner.

Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Mary H. Williams, Assistant Solicitor General, waived appearance for respondent Employment Department.

No appearance for respondent Karen S. Grosh.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

HASELTON, J.

## HASELTON, J.

Employer, Marian Estates,[1] petitions for review of the Employment Appeals Board's determination that claimant is entitled to unemployment benefits. The Board concluded that claimant had "good cause" for voluntarily leaving her employment, ORS 657.176(2)(c); OAR 471-030-0038(4), because, at the time claimant quit, employer was disputing her alleged entitlement to overtime for work that she had previously performed. We disagree with that conclusion and, accordingly, reverse.

The material facts, as found by the Board, are as follows: Claimant worked for employer from January 3, 1997, until November 20, 1997. Throughout that time, claimant's husband was her immediate supervisor. Initially, claimant worked as a cook and waitress at employer's restaurant and was paid by the hour. However, on or about March 1, 1997, employer's director of human resources drafted a job description for claimant as assistant restaurant manager; that description included substantial management duties, including hiring and firing of restaurant personnel. The director of human resources gave the job description to claimant's supervisor (who was also claimant's husband) for claimant to sign, but claimant never signed the description because she did not want to work as a manager. Neither claimant nor her supervisor told the director of human resources or anyone else in upper management that she had rejected the assistant manager duties.

Between March 1 and November 20, 1997, claimant did not, in fact, perform managerial duties. During that period, claimant often worked more than 40 hours a week, but employer did not pay her overtime due to what upper management understood to be her exempt/managerial status. Claimant, who apparently received "straight time" compensation for the additional hours, made no express demand or claim for overtime. However, she discussed the situation with her supervisor, and he, in turn, on several occasions spoke with his immediate supervisor about

---

[1] Although the Board's order denominated employer "Marion Estates," the proper spelling is "Marian."

whether claimant should receive overtime. There was no evidence that that supervisor ever communicated those discussions to upper management or that claimant ever complained about that inaction.

In early November, employer's owner directed claimant's supervisor to reduce employee work hours to 40 hours a week and specifically identified claimant as among the employees whose hours needed to be reduced. On November 14, 1997, the owner and the director of human resources met with claimant and her supervisor and directed that claimant was to work no more than 40 hours a week.

On November 18, 1997, employer received a letter from claimant's attorney requesting information pertaining to a possible wage claim for past unpaid overtime. That letter, which asked that the documentation be sent by December 12, stated that all future correspondence should be directed to the attorney and not to claimant. Until receiving that letter, neither the employer's owner nor its director of human resources was aware that claimant believed that she was entitled to overtime.[2]

On November 19, employer's attorney faxed a letter to claimant's attorney, which provided some of the requested information and promised to promptly provide the balance. That letter explained employer's understanding that claimant had been working—and, indeed, continued to work—as assistant restaurant manager[3] and then continued:

"Management will be providing [claimant] with a specific work schedule, and she will be asked to maintain that work schedule, which includes a restriction of working no more than 40 hours per week, per the schedule. Marian Estates does not wish to incur any overtime obligation as to [claimant] and has found it necessary to devise this work schedule in order to protect its position should there be any

[2] In so finding, the Board necessarily rejected claimant's supervisor's testimony that he had expressly spoken with the owner about the overtime issue before November 1997.

[3] The letter also noted that claimant had initially been hired in a nonovertime-exempt position and that, in that position, "whenever her hours exceeded 40 hours in a given week, or otherwise required overtime, she was paid overtime as to her hourly wages."

legal merit to your assertion that overtime must be paid for the Assistant Restaurant Manager position. We firmly believe that this is properly an exempt position, and that overtime is not due, but it is obviously in the best interests of Marian Estates to protect itself should we be incorrect about this.

"* * * * *

"Should you have any other legal concerns about the employment relationship between [claimant] and Marian Estates, please contact me. Otherwise, we anticipate that [claimant] will continue to work in the Assistant Restaurant Manager position under the new work schedule in a business-like fashion while I deal with you as to the unpaid overtime wages allegation."

On November 20, 1997, claimant sent employer a resignation letter stating, "I am unable to continue my employment if you are unwilling to address my unpaid overtime." At the time she submitted her resignation, claimant was not personally aware that employer was not going to require her to work more than 40 hours a week; instead, claimant understood that she might be required to work more than 40 hours a week in the future.[4] The Board found that "[c]laimant quit work because the employer had not paid her overtime wages after March 1, 1997, and considered claimant not entitled to overtime pay."

Claimant subsequently sought unemployment benefits, and employer contested that claim, asserting that claimant "voluntarily left work without good cause." ORS 657.176(2)(c). At the hearing before the administrative law judge (ALJ), claimant's attorney acknowledged that the sole issue was whether employer's alleged *past* nonpayment of overtime constituted "good cause" to quit; that is, there was no contention that, as of November 20, 1997, claimant was faced with the prospect of working more than 40 hours a

---

[4] Employer asserts, quite plausibly, that the Board's finding in that regard cannot be squared with its finding that claimant was present at the November 14 meeting in which her supervisor was told that claimant was not to work more than 40 hours a week. Given our conclusion that, on November 19, claimant was, at least, *constructively* aware of employer's pledge not to require her to work more than 40 hours a week until the merits of her claim were resolved, *see* 158 Or App at 636, we need not resolve that apparent incongruity.

week without being paid overtime. At the hearing, claimant stated simply, "I couldn't continue working there without having them pay me back overtime." The ALJ denied benefits, concluding that claimant "could have continued the employment while continuing her effort through litigation to determine whether or not she was entitled to overtime pay."

The Board, relying principally on our decisions in *Cavitt v. Employment Div.*, 105 Or App 81, 803 P2d 778 (1990), and *J. Clancy Bedspreads & Draperies v. Wheeler*, 152 Or App 646, 954 P2d 1265 (1998), reversed. The essence of the Board's reasoning was: (1) Although employer's upper management was unaware until November 17, 1997, of claimant's belief that she was entitled to overtime, claimant had, in fact, communicated that belief to her supervisor[5] who had, in turn, discussed the issue with his supervisor on several occasions. (2) Claimant was not, in fact, employed in an overtime-exempt status. (3) At the time claimant resigned, she believed that employer expected her to work more than 40 hours a week without overtime in the future and that, because employer, through its counsel, was contesting claimant's entitlement to back overtime pay, "the employer was not prepared or willing to immediately remedy the issue related to claimant's back wages." Consequently:

"We are persuaded that claimant had no reasonable alternative to quitting work. Claimant had brought to the employer's attention, through her supervisor and his supervisor, that she was not performing work in an exempt capacity. The employer took no action to pay for her overtime. Further, even when claimant obtained counsel, the employer continued to deny that she was entitled to overtime pay. No reasonable person would continue to work for an employer who failed to comply with the wage and hours laws of the state. Furthermore, we are not persuaded that it would have been reasonable for claimant to have continued working for the employer for an indefinite period of time while the matter was resolved through legal negotiations or litigation. [*See J. Clancy Bedspreads & Draperies*] * * * We are persuaded that the relationship between claimant and the employer was irreparably damaged."

---

[5] Employer acknowledges that the fact that the supervisor was married to claimant did not alter his status as employer's agent.

On review, employer raises a number of objections to the Board's findings. However, employer's principal contention is that the Board misapplied the "good cause" standard refined in OAR 471-030-0038(4):

"Good cause for voluntarily leaving work under ORS 657.176(2)(c) is such that a reasonable and prudent person of normal sensitivity, exercising ordinary common sense, would leave work. * * * For all individuals, the reason must be of such gravity that the individual has no reasonable alternative but to leave work."

Employer asserts that the facts as found by the Board do not rationally support its determination that claimant had good cause to quit. *See, e.g., J. Clancy Bedspreads & Draperies*, 152 Or App at 650; *Cavitt*, 105 Or App at 83. We agree.

We begin by reiterating that, as framed by the parties below, the "good cause" issue pertains *only* to nonpayment of *past* overtime. Claimant's letter of resignation and her testimony before the ALJ are explicit: She quit because of the employer's refusal to pay "back overtime." Thus, to the extent that the Board purported to rely on claimant's subjective "understanding" concerning her future status, including the potential for working more than 40 hours a week without receiving overtime, that reliance was erroneous. In all events, regardless of claimant's personal belief, her attorney had received employer's attorney's faxed letter on November 19, *before* claimant resigned on November 20. Because claimant's attorney was her agent for purposes of this dispute,[6] claimant must be deemed to have had constructive knowledge of the content of that letter. *See, e.g., Ellingsworth v. Jackson*, 170 Or 34, 45, 131 P2d 781 (1942). *See also* 7A CJS *Attorney & Client* § 182 (1980) ("Notice to Attorney as Notice to Client").

With the issue so focused, the question is whether, on these facts, the Board could rationally determine that claimant had "no reasonable alternative but to leave work." OAR 471-030-0038(4). In that regard, employer argues,

---

[6] As noted, *see* 158 Or App at 633, claimant's attorney had directed that all future correspondence be sent to him and not to claimant.

"[c]laimant's reasonable alternative was to allow her attorney to do his job representing her interests *before* she decided to resign." (Emphasis in original.) We agree.

Claimant had a substantial monetary claim against her employer. She had communicated her concerns about that claim, based on a continuing nonpayment, to her supervisor, but when nothing was done, she did not resign. Instead, she resigned only after: (1) upper management became aware of, and stated that it intended to contest, the claim; and (2) employer took steps—whose efficacy claimant does not question—to ensure that there would be no continuation or recurrence of the disputed circumstance. Thus, when claimant resigned, she had a disputed claim against her employer and the unquestioned assurance that the circumstances giving rise to that claim would not reoccur. In that regard, claimant was no different from thousands of other employees with pending litigation—*e.g.*, workers' compensation claims—against their employers. In the circumstances presented here, there was a reasonable alternative to quitting: continuing to work while litigating the claim.

*Cavitt* and *J. Clancy Bedspreads & Draperies*, which the Board invoked, are both materially distinguishable because both involved the combination of a past default *plus the substantial risk of recurrence*. In *Cavitt*, the claimant quit after the employer twice paid him with checks that were subsequently dishonored. In concluding that claimant had good cause to quit we said simply, "No one should be expected to *continue* working for an employer who pays with bad checks." *Cavitt*, 105 Or App at 84 (emphasis added).

Similarly, in *J. Clancy Bedspreads & Draperies*, we concluded that the claimant had good cause to quit where the employer had repeatedly failed to pay overtime to which the claimant was entitled. In so holding, we rejected the employer's argument that litigating the overtime claim represented a reasonable alternative to quitting. *J. Clancy Bedspreads & Draperies*, 152 Or App at 650. However, that conclusion rested, in turn, on the assumption that the underlying dispute and exposure was continuing:

"EAB found that employer refused to pay claimant overtime pay and reasoned that 'it would have been futile for

claimant to have *continued to work* for the employer in the hope of resolving their *continuing disagreement* with regard to overtime pay.' Additionally, '[c]laimant could not reasonably have been expected to *continue* working for the employer for an indefinite period of time while the BOLI complaint was processed.' This reasoning provides a substantial basis for EAB's conclusion that filing a wage claim with BOLI while remaining employed was not a reasonable alternative for claimant." *Id.* (emphasis added).

Those circumstances did not exist here. Claimant never asserted that she quit because of prospective or continuing concerns. Nor did she ever question the good faith or efficacy of employer's pledge that she would not be required to work more than 40 hours a week until the overtime dispute was resolved. Consequently, the Board erred in determining that claimant had no reasonable alternative but to leave work.

Reversed.